**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JOHNATHAN ANDREW DOODY,
       *Petitioner-Appellant,*

v.

DORA B. SCHRIRO; MEGAN SAVAGE;
ATTORNEY GENERAL OF THE
STATE OF ARIZONA,
       *Respondents-Appellees.*

No. 06-17161

D.C. No.
CV-98-00528-EHC

OPINION

Appeal from the United States District Court
for the District of Arizona
Earl H. Carroll, District Judge, Presiding

Argued and Submitted
December 3, 2007—San Francisco, California

Filed November 20, 2008

Before: Betty B. Fletcher, Marsha S. Berzon,
Johnnie B. Rawlinson, Circuit Judges.

Opinion by Judge Berzon

15611

**COUNSEL**

Alan M. Dershowitz and Victoria B. Eiger, Dershowitz, Eiger & Adelson, P.C., Cambridge, Massachusetts, and New York, New York for the petitioner-appellant.

Terry Goddard, Attorney General of Arizona, Randall M. Howe, Chief Counsel, and Joseph T. Maziarz, Assistant Attorney General, Criminal Appeals Section, Phoenix, Arizona for the respondents-appellees.

**OPINION**

BERZON, Circuit Judge:

Seventeen-year-old Johnathan Doody was interrogated overnight for twelve hours straight. When, after several hours, he fell silent and refused to answer the officers' questions, the officers persisted, asking dozens of questions, many over and over again, and telling him he had to answer them. The resulting confession was used in Arizona state court to convict him of multiple counts of murder and robbery. He now petitions for a writ of habeas corpus on the grounds that (1) the warnings he received pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), were insufficient; (2) the officers' words and con-

duct during the interrogation effectively "de-*Mirandized*" him; and (3) his confession was involuntary. We affirm the district court's denial of the writ on Doody's *Miranda* claims, but reverse on his voluntariness claim.

## I. BACKGROUND

### A.

#### 1.

On August 10, 1991, nine bodies were discovered in a Thai Buddhist temple outside Phoenix, Arizona. The victims were monks and other temple residents; each had been arranged lying face-down in a circle and shot in the head. Their living quarters had been ransacked and robbed.

The temple murders sparked a massive investigation. A task force of local, state, and federal law enforcement began to pursue leads. Ballistics reports showed that one of the weapons involved was a .22 Marlin rifle, so task force members were on the lookout for such rifles.

In late August, a security guard on the local Air Force base located a .22 Marlin rifle during a consent search of a car belonging to Rolando Caratachea, a local high school student. Shortly afterward, task force detective Richard Sinsabaugh followed up by asking Caratachea if he could borrow the rifle. Although Detective Sinsabaugh wanted the rifle for ballistics testing to determine if it was the murder weapon, he told Caratachea that it was suspected of being stolen. Caratachea assured Detective Sinsabaugh the rifle was not stolen, but agreed to let him take it. When he went to Caratachea's apartment to retrieve the rifle, Detective Sinsabaugh learned that Caratachea shared the apartment with two roommates, one of whom was seventeen-year-old Johnathan Doody.

Doody was born in Thailand and moved to the United States as a child with his American stepfather, who was in the Air Force, and his Thai mother.[1] He speaks English with apparent fluency but a light accent.[2] At the time of the investigation, Doody was beginning his junior year in high school, worked at the local Air Force base's commissary, and was a member of the junior Reserve Officers' Training Corps ("ROTC").

While Caratachea's rifle was being tested, the task force pursued other avenues of investigation, including interviewing members of the local Thai community who might have useful information about the temple or its residents. In mid-September, Detective Sinsabaugh interviewed Doody as part of this effort. Doody's brother had lived at the temple for a while before the murders, and Doody had frequently visited him during that period. During this interview, which lasted about an hour, Doody talked about his brother's experience and Doody's visits to the temple.

On the same day as this interview, the task force received a tip targeting four men from Tucson, who later became known as the "Tucson Four," as the perpetrators of the murders. After these men were interrogated by task force members, some of whom also conducted Doody's later interrogation, all four confessed to the crimes. By early Octo-

---

[1] Doody's brief recounts additional evidence about his background produced at the sentencing hearing. Under Arizona law, however, review of a decision on a motion to suppress is based solely on evidence before the court at the time of the motion, *State v. Spears*, 908 P.2d 1062, 1069 (Ariz. 1996), and the Arizona Court of Appeals considered only such evidence. *State v. Doody*, 930 P.2d 440, 445-46 n.4 (Ariz. Ct. App. 1996). Because we hold Doody's confession involuntary based on the evidence presented at the suppression hearing, we need not decide whether a habeas court in this situation could properly consider the additional evidence from the sentencing hearing.

[2] The characteristics of Doody's speech are evident from a review of the audio tapes in evidence.

ber, the Tucson Four had been charged with the murders, and the task force members believed they had solved the crime. The murder weapon, however, still had not been identified.

Then, on October 24, a laboratory report concluded that Caratachea's rifle was the murder weapon. The task force immediately decided to interview Caratachea and all of his known friends. Because Doody and Caratachea had been roommates, Doody was on the interview list. The following day, when task force members interviewed Caratachea, he told them that, just before the temple murders, he loaned his rifle to Doody and Alessandro Garcia, a sixteen-year-old friend of Doody and Caratachea.

**2.**

On the evening of Friday, October 25, 1991, while Caratachea's interview was still in progress but after Caratachea told officers he had loaned the rifle to Doody, two task force members approached Doody at a high school football game and asked him to come to the police station to answer questions. He agreed and was driven to the station by one of the officers.

At 9:25 p.m., two police officers began an interview that did not end until 10:00 a.m. the following morning. The entire interview was audio-taped. Doody was not informed of the taping and was not aware of it.[3] The interview took place in a carpeted, ten-foot by eighteen-foot room furnished only

---

[3]All seventeen audio tapes were part of the record below. It appears, however, that the parties included transcripts of only nine of the tapes in the district court record. The parties supplied this Court with the transcripts of the remaining eight tapes.

In general, appellate courts are limited to the evidentiary record presented to the lower court. FED. R. APP. P. 10(a). For that reason, and because they are in any event more accurate, we rely on the audio tapes rather than the written transcripts.

with three chairs. Doody was offered food, drink, and bath-
room breaks several times during the night, although he never
accepted food. Other than two brief bathroom breaks in the
morning hours, the interview went on continuously during the
twelve hours.

The interrogation was initially conducted by Detectives
Riley and Munley. Detective Riley began with a casual intro-
duction:

> [S]ince we're in kind of a formal setting and things
> like that and because [Detective Munley's] a police
> officer and I'm a police officer and things like that,
> sometimes some of the questions that we get into
> are, are a little bit sensitive and things like that. And
> what I'd like to do is before we, we go into that is
> read something to you and, so that you understand
> some of the protections and things that, that you
> have. It's not meant to scare you or anything like
> that. Don't, don't take it out of context, okay.

He asked Doody if he had heard of *Miranda* warnings; Doody
responded that he had not. Detective Riley repeatedly assured
Doody that the warnings were "not meant to scare you" and
told him, "I don't want you to feel that because I'm reading
this to you that we necessarily feel that you're responsible for
anything. It's for your benefit, it's for your protection and for
ours as well."

Although Detective Riley used a "juvenile *Miranda* warn-
ings" form,[4] he orally expanded upon the written form. In par-
ticular, when reviewing the right to an attorney, Detective
Riley explained that a lawyer will "help you concerning the

---

[4]In addition to the traditional *Miranda* warnings, this form also asks if
the juvenile wants a parent or guardian present during questioning and
warns that the juvenile's case may be handled by adult, rather than juve-
nile, court.

crime or any kind of offense that we might think that you or somebody else is involved in, if you were involved in it, okay. Again, it [does] not necessarily mean that you are involved, but if you were, then that's what that would apply to, okay."

At the conclusion of each warning, Doody indicated that he understood and initialed the juvenile *Miranda* form. Doody agreed to speak to the officers without a parent or attorney present, and the interrogation commenced.

Detectives Riley and Munley began by asking Doody casual questions about his roommates and friends, including which of his friends and acquaintances owned guns. Doody immediately volunteered that Caratachea owned a gun, but denied ever having borrowed or shot it. The officers then asked Doody about the temple murders, inquiring where he was at the time of the murders and when he learned of them. Doody readily answered the questions, stating that on the night of the murders he saw a movie with a friend and then went home. The officers then asked more questions about the temple, the victims, and Doody's visits to the temple before the murders.

After about an hour, Detective Riley stopped the questioning to deliver a brief lecture about how important it was for Doody to tell them the truth, and then, pointedly, asked Doody again if he or anyone he knew had ever borrowed Caratachea's rifle. Doody answered that he had not, but that Garcia might have. Detective Riley responded that "there are some things about the gun that I, I know that you have knowledge about," and urged Doody to "be up front with me, be honest with me."[5]

---

[5]As noted above, before Doody's interrogation began, Caratachea had told task force members that he loaned the rifle to Doody and Garcia shortly before the murders. Although Caratachea's interrogation continued for several hours more, he never confessed to any involvement in the murders.

Detective Riley again asked Doody about his whereabouts on the night of the murders and whether he knew anything about the murders other than what was in the news. Doody denied any knowledge. Detective Riley again warned Doody that "I want to stress with you the importance of being, being up front and honest," and told him that "[w]hat you're saying [about not borrowing Caratachea's rifle] is not, is not true." In response, Doody again denied ever borrowing Caratachea's rifle but repeated that Garcia might have borrowed it.

Detectives Riley and Munley both proceeded to lecture Doody on how important it was for him to tell them the truth, and, now becoming more specific, informed him they "kn[e]w that you were along with at least one other person when [Caratachea]'s rifle was borrowed." They then demanded that he tell them about the borrowing of Caratachea's rifle, using words that went beyond urging or imploring: "[I]t's so important for you, for you to tell us. *I mean you have to tell us. You have to.*" (Emphasis added.) Almost immediately after these comments, at about 11:45 p.m., Doody admitted that he and Garcia had borrowed Caratachea's rifle, but insisted that the incident had occurred well before the temple murders. He later explained his earlier reluctance to admit to borrowing the rifle: First, Detective Sinsabaugh had told Caratachea the gun might be stolen, and Doody did not want to be associated with stolen property; second, the officers' pointed questions about the gun plainly implied that it had some link to the temple murders. Either way, Doody said, he was afraid to admit any connection to the rifle.

Detectives Riley and Munley launched into several more monologues on how important it was for Doody to tell them the truth and how they knew he was not doing so. This time, however, they told Doody that Caratachea's rifle was the murder weapon. Doody insisted that he returned the rifle to Caratachea before the murders, and continued to deny involvement in or knowledge of the murders despite the officers' repeated

questions and insistence that he knew more than he was telling them.

Undeterred by his denials, the officers pushed harder. For almost an hour, from about 1:50 a.m. to 2:45 a.m., Detectives Riley and Munley told Doody that the case was "busted wide open," that he had to protect himself from what others were saying about him by telling them the truth, and that he knew exactly what happened at the temple. In the few times Doody spoke during this period he denied any knowledge or involvement.

At around 2:45 a.m., Detectives Riley and Munley were joined by Detective Sinsabaugh, who had interviewed Doody in September. For over two hours, all three officers were present in the room.[6] The officers began to barrage Doody with questions. Doody essentially stopped responding altogether. They asked him five times whose plan it was to go to the temple; Doody did not answer once. They asked fourteen times whether it was Caratachea's idea; Doody answered once — that he did not know. They asked twenty-five times whether Doody was at the temple; Doody did not answer once. During this entire sequence, lasting twenty minutes, Doody answered one out of forty-five questions. Framing the repetitious questioning were demands for answers: "You have to tell us," the officers told Doody, "We have to know; you have to let us know." And, frustrated by Doody's silence, one officer sharply directed him: "Answer, Jonathan, answer."

The officers next began asking a series of questions about whether Doody was keeping silent because someone had threatened him. Doody answered a few of these questions, but fell silent again when the officers returned to asking him — seven times without a response — whose idea it was to go to

---

[6]At some point during this period, the three officers were joined by a fourth, Captain White. It is not clear how long all four officers were present in the interrogation room.

the temple. Doody remained silent this time for eight minutes, failing to respond to thirty questions in a row. In the face of Doody's silence, Detective Sinsabaugh warned him, "I'm gonna stay here until I get an answer," and directed: "You've got to answer me"; "Jon, answer me"; "Now, you — start talking to me"; "Tell me Jon. Talk to me, Jon. Jon — no, no, it's not gonna — you're not gonna cut it that way, man. You're gonna be a man about it. You're gonna talk to me Jon"; "[S]tart talking to me, Jon. Don't sit there like that, talk to me." Doody only broke his silence when Detective Sinsabaugh asked him nine times whether he remembered Detective Sinsabaugh's name, or recalled talking to him previously. Many of Doody's answers during this time are whispers, barely audible on the tapes.

At about 3:30 a.m., Detective Sinsabaugh asked him ten times if he had been involved with the temple incident, directing him: "Answer me. Answer me, Jonathan. Jonathan, answer me. Answer me. What, what's the problem? Answer me, Jonathan." After Detective Sinsabaugh asked yet again if Doody had been involved, Doody finally responded, "Yes." More than six hours into the interrogation, after forty-five minutes of relentless questioning in the face of Doody's almost complete silence, this was the first statement Doody made linking himself to the murders.

For about a half hour after this one-word response, most of the officers' questions again went unanswered; what answers Doody gave were largely monosyllabic. Showing increasing impatience with his silence, Detective Sinsabaugh told him, "if it's gonna take you all night to tell me two little simple things, we're gonna have a problem." But Doody still remained silent when asked fourteen times whether Caratachea was involved. Detective Sinsabaugh's frustration is plain: "Say something. Say something, Jonathan. Come on, man, this is ridiculous. Say something. What's your name? What's your name, Jonathan? Jonathan, what's your name? What's your last name?"

Shortly after 4:00 a.m. — six and one-half hours after the interrogation began, and without a single break in questioning — Doody began to talk about the temple murders in a narrative fashion. He told the officers that he, Garcia, Caratachea, a friend of Caratachea's named George, and one other person went to the temple for what he thought was a plan to test the temple's security system. He described how the monks were roused from their rooms and arranged in the living room; that the rooms were ransacked and valuables placed in duffle bags; and that, after one of the monks recognized George, George said they should leave no witnesses. The others told Doody to go outside to see if the temple was soundproof; he then heard shots fired and ran back inside. At that point, everyone fled.

The officers were still, at that time, convinced that the Tucson Four were involved, and refused to believe Doody's assertion that they were not, repeated in response to several inquiries. After maintaining for almost two hours that only five people went to the temple, that all of them were white, and that the Tucson Four were not among them, Doody finally agreed that about ten people were involved, that two or three were black,[7] and that he did not know whether some of them were from Tucson or not. Throughout, Doody maintained that he never knew until the events unfolded that the plan involved robbery or murder.

The interrogation ended at about 10:00 a.m., over twelve hours after it began. For almost nine hours, the interrogation never paused; in the final three hours, Doody had only two short breaks to use the restroom. By the end, he was sobbing.

---

[7]Although the record does not so indicate, the officers' pointed questions about the race of the people involved suggests that at least one of the Tucson Four was black.

## B.

Eventually, the Tucson Four were cleared of any wrongdoing, and the state's new theory was that Doody and Garcia acted alone.[8] The two were indicted for murder and armed robbery and stood trial as adults.

## 1.

Doody moved to suppress his recorded statements, arguing that the *Miranda* warnings were inadequate and that his confession was involuntary. During a ten-day suppression hearing, which also addressed Garcia's motion to suppress his own statements, several task force members testified; Doody did not. The evidence included the audio tapes of Doody's confession and accompanying transcripts.

Detective Riley testified that, during the *Miranda* warnings, Doody "was very attentive" and displayed no confusion or doubt. He testified that Doody's demeanor changed over the course of the interview, becoming less attentive and more quiet, but that Doody never "display[ed] any real overt sign of being fatigued or tired." Detective Sinsabaugh testified that, at the time Doody first confessed involvement in the temple murders, he was "alert" and "sitting upright and erect." Detective Sinsabaugh also testified that he considered Doody "real intelligent," because he was working towards the goal of becoming an Air Force pilot.

The trial court denied Doody's motion to suppress, finding the *Miranda* warnings adequate and the confession voluntary.

---

[8]Garcia, interrogated on the same night as Doody, also confessed to involvement in the murders.

## 2.

The trial lasted thirty-four days. The state's theory was that Doody hatched a plan to rob the temple, intended to murder the monks to conceal the robbery, and enlisted Garcia to help him execute the scheme. Doody's confession — that five, or as many as ten, people were involved and that he did not know of the planned robbery or murders — was at odds with the state's theory of his role.

Nonetheless, the state played all seventeen tapes of Doody's interrogation for the jury and relied heavily on them, arguing that various portions showed his guilt and the rest were lies. The state's star witness was Garcia, who pled guilty prior to trial in exchange for the state's agreement not to seek the death penalty.[9] Garcia testified that no one other than he and Doody knew of or participated in the murders. He provided a detailed description of the events of that night. According to Garcia, Doody initiated the plan to rob the temple to get money to buy a car. This motive testimony was bolstered by evidence that shortly after the murders, Doody paid $1,000 for a car.

Three witnesses testified that Doody told them, before the interrogation at which he confessed, that he had committed the temple murders. One witness testified that Doody said he and the Tucson Four had together carried out the crime; the witness thought Doody was joking at the time. Another witness stated that Doody said the military's Office of Special Investigations ("OSI") was responsible for the temple killings, and that Doody used to kill people "execution style" for money. This witness also thought Doody was joking, and testified that other students at their high school — herself

---

[9]At the same time, Garcia also pled guilty to an unrelated murder committed after the temple murders. Under the terms of the plea agreement, Garcia would be sentenced for both crimes after testifying at Doody's trial and could receive between 25 and 271 years.

included — jokingly claimed responsibility for the murders. The third witness testified that Doody told him the monks were a national security threat, and that Doody eliminated them for the OSI. This witness, according to another witness, had a reputation for being gullible.

The state also presented some evidence connecting Doody to items stolen from the temple. Several items had been pawned by Caratachea's friend Angel Rowlett; Rowlett and another friend of Caratachea's testified, with immunity, that they stole these items from Doody.[10] Other items stolen from the temple were recovered from Garcia's bedroom, which he shared with Doody at the time his room was searched.

The defense theory was that the robbery and murders were committed by Caratachea, Garcia and others, and that Doody either had nothing to do with the incident or was there as an innocent bystander, believing that they were only going to see if they could breach the temple's security system. Doody did not testify at trial.

The jury returned a verdict of guilty on all nine counts of first-degree murder. As indicated by the special verdict form, the jury convicted Doody on a theory of felony murder, rejecting a theory of premeditated murder.[11] Doody was also convicted of multiple counts of armed robbery, one count of burglary, and one count of conspiracy to commit armed rob-

---

[10]Caratachea invoked his Fifth Amendment rights and did not testify at the trial.

[11]Under Arizona law, "[a] person commits first degree murder if:

"1. Intending or knowing that his conduct will cause death, such person causes the death of another with premeditation; or

"2. Acting either alone or with one or more persons such person commits or attempts to commit . . . robbery . . . and in the course of and in furtherance of such offense or immediate flight from such offense, such person or another person causes the death of any person." ARIZ. REV. STAT. § 13-1105(A) (1991).

bery. The trial court sentenced Doody to nine consecutive life terms for the murder counts and additional time for the other counts.

## 3.

Doody appealed his conviction on several grounds, including challenges to the adequacy of the *Miranda* warnings and the voluntariness of the confession. The Arizona Court of Appeals affirmed the trial court's denial of the motion to suppress. *State v. Doody*, 930 P.2d 440 (Ariz. Ct. App. 1996).[12]

The court found that the *Miranda* warnings were adequate: "[T]he officers advised Doody of his *Miranda* rights in a clear and understandable manner . . . . The officers read each warning from a standard juvenile form and provided additional explanations as appropriate."

The court further concluded that the confession, despite the length of the interrogation and Doody's juvenile status, was voluntary:

> Although the entire interrogation lasted approximately thirteen hours, Doody admitted he had borrowed Caratachea's rifle at the time of the temple murders after approximately two and one-half hours of questioning. Doody admitted he had participated in the temple robbery after approximately six and one-half hours of questioning, and his description of the events at the temple spanned nearly two hours . . . .
>
> Although Doody characterizes the tone of the interrogation as coercive, the audio tapes reveal a courteous, almost pleading style of questioning during

---

[12]The Arizona Supreme Court denied review and the United States Supreme Court denied certiorari.

most of the interview. Each of the officers involved in the interrogation testified at the suppression hearing that Doody remained alert and responsive throughout the interrogation and did not appear overtired or distraught. Our review of the audio tapes confirms the officers' testimony.

The court noted also that "the officers offered Doody food and drinks and accommodated his requests to use the restroom" and that Doody "specific[ally] consent[ed] to speak with the officers without his parents." As for the interrogation tactics used, the court found that "although Doody did not speak for long periods during the interrogation, he never invoked his right to remain silent or his right to an attorney."

Doody subsequently filed a petition for a writ of habeas corpus in federal court. The district court denied the writ. Doody now appeals.

## II.  STANDARD OF REVIEW

We review the Arizona Court of Appeals opinion as the last reasoned state court opinion. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991). Because Doody filed his federal habeas petition after the effective date of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), he can prevail only if he can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A state court decision will be "contrary to" federal law if it "applies a rule that contradicts governing law set forth in [Supreme Court] cases" or "confronts a set of facts that are materially indistinguishable from" a Supreme Court case, yet reaches a different result. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). A state court decision will involve an "unreasonable application of" federal law only if it is "objectively unreasonable." *Id.* at 409.

The prejudicial impact of any constitutional error is assessed by asking whether the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)); *see also Fry v. Pliler*, 127 S.Ct. 2321, 2328 (2007) (holding that the *Brecht* standard applies whether or not the state court recognized the error and reviewed it for harmlessness).

We review the district court's denial of Doody's petition for a writ of habeas corpus de novo. *Clark v. Murphy*, 331 F.3d 1062, 1067 (9th Cir. 2003).

## III. DISCUSSION

Doody puts forward three reasons why his confession should have been suppressed — two grounded in *Miranda* principles, one in the voluntariness requirement.

The first *Miranda* claim is that the *Miranda* warnings were inadequate. Doody points to particular language the officers used that he argues mischaracterized the nature of the right to counsel. He further maintains that the officers purposefully — and effectively — downplayed the significance of the warnings, so that Doody would be more likely to waive his rights. He argues that this strategy, coupled with Doody's particular vulnerability to it — because of his age, his inexperience with law enforcement, and his cultural background — undermined the ultimate goal of the warnings: to combat the "inherently

compelling pressures" of custodial interrogation by ensuring that a suspect is "adequately and effectively apprised of his rights." *Miranda*, 384 U.S. at 467.

Doody's second *Miranda* claim is that even if the initial warnings were adequate, the officers' subsequent words and conduct effectively "de-*Mirandized*" him. He argues that the officers told him that what he said would remain between them — "What you tell us right now is gonna stay right here"; "Jonathan, we're not even gonna go out and be telling every-[one] what you're saying. That's not [the] way we do business"; "Between us, was Alex with you"; "it's between us and you: who knew the guys in Tucson?" — and that these statements contradicted and negated the earlier warning that anything Doody said could and would be used against him. Worse, he contends, were the officers' multiple statements like "You have to tell us," "We have to know; you have to let us know," and "I'm gonna stay here until I get an answer." Doody regards these statements, coupled with the officers' repeated questioning in the face of his lengthy silences, as having effectively told him that he did *not* have the right to remain silent, and that the interrogation would not end until he confessed. Any previous understanding of his rights, he argues, was thus negated, violating the principle of *Miranda*.

Finally, Doody claims that his confession was coerced and thus involuntary, so its admission at trial violated his Fourteenth Amendment right to due process. *See Dickerson v. United States*, 530 U.S. 428, 433-34 (2000). He points particularly to his age — seventeen and one-half years old — and the corresponding susceptibility to pressure from authority figures that comes with youth. The interrogation lasted over twelve hours, through an entire night, without food or significant breaks. He had never been arrested or interrogated as a suspect before that night. His parents were not present; in fact, Doody maintains, the task force went to some length to ensure their absence. Doody also challenges the state court decision as resting on an unreasonable determination of the facts. In

particular, he argues that the court of appeals' findings that the interrogation involved "a courteous, almost friendly style of questioning during most of the interview" and that Doody remained alert and responsive throughout are objectively unreasonable. The evidence in fact shows, he urges, that he remained nonresponsive and silent for long stretches, while the officers, although sometimes using a pleading or courteous tone, at other times issued emphatic demands and essentially told him the interrogation would continue until he confessed.

In short, Doody paints an overall picture of downplayed warnings, a softly induced waiver of rights, and conduct conveying the message that Doody would not be left alone until he confessed, all targeted at an unsavvy, increasingly sleep-deprived teenager.

## A.

[1] This case requires us to consider the interplay between the *Miranda* and voluntariness analyses, an interplay which, on the facts before us, informs both analyses. We therefore begin by considering that interaction, and then proceed to discuss first the *Miranda* issues and then the voluntariness question.

Although generally viewed as distinct, the two doctrines originated from the same concerns. "Over time, our cases recognized two constitutional bases for the requirement that a confession be voluntary to be admitted into evidence: the Fifth Amendment right against self-incrimination and the Due Process Clause of the Fourteenth Amendment." *Dickerson*, 530 U.S. at 433. Whereas the Fifth Amendment by its text safeguards the individual against being "compelled in any criminal case to be a witness against himself," U.S. Const., amend. V, the due process protection stems from the principle that "tactics for eliciting inculpatory statements must fall within the broad constitutional boundaries imposed by the

Fourteenth Amendment's guarantee of fundamental fairness," *Miller v. Fenton*, 474 U.S. 104, 110 (1985); *see also id.* at 109 ("[C]onfessions procured by means 'revolting to the sense of justice' [can]not be used to secure a conviction" (quoting *Brown v. Mississippi*, 297 U.S. 278, 286 (1936))).

**[2]** The due process protection is embodied in a voluntariness inquiry that asks " 'whether a defendant's will was overborne' " by looking at the " 'totality of all the surrounding circumstances.' " *Dickerson*, 530 U.S. at 434 (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)); *see also Schneckloth*, 412 U.S. at 225-26 (" 'Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process.' " (quoting *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961))). The assessment of the totality of the circumstances may include consideration of the length and location of the interrogation; evaluation of the maturity, education, physical and mental condition of the defendant; and determination of whether the defendant was properly advised of his *Miranda* rights. *Withrow v. Williams*, 507 U.S. 680, 693-94 (1993). Thus, by its nature, the voluntariness inquiry requires a case-by-case assessment, leading courts to grapple with the application of voluntariness principles in a variety of circumstances. *See Schneckloth*, 412 U.S. at 224 ("[Confession] cases yield no talismanic definition of 'voluntariness,' mechanically applicable to the host of situations where the question has arisen. 'The notion of "voluntariness,' " Mr. Justice Frankfurter once wrote, 'is itself an amphibian.' " (quoting *Culombe*, 367 U.S. at 604-605)).

*Miranda* considered the Supreme Court's longstanding voluntariness jurisprudence in the then-new context of modern police custodial interrogations. This context "brought with it an increased concern about confessions obtained by coercion." *Dickerson*, 530 U.S. at 434-35. Drawing from police

manuals and texts used by law enforcement, *Miranda* described the practices used by police officers during these interrogations to induce a suspect to confess:

> The texts . . . stress that the major qualities an interrogator should possess are patience and perseverance. One writer describes the efficacy of these characteristics in this manner:

> "In the preceding paragraphs emphasis has been placed on kindness and stratagems. The investigator will, however, encounter many situations where the sheer weight of his personality will be the deciding factor. Where emotional appeals and tricks are employed to no avail, he must rely on an oppressive atmosphere of dogged persistence. He must interrogate steadily and without relent, leaving the subject no prospect of surcease. He must dominate his subject and overwhelm him with his inexorable will to obtain the truth. He should interrogate for a spell of several hours pausing only for the subject's necessities in acknowledgment of the need to avoid a charge of duress that can be technically substantiated. In a serious case, the interrogation may continue for days, with the required intervals for food and sleep, but with no respite from the atmosphere of domination. It is possible in this way to induce the subject to talk without resorting to duress or coercion. The method should be used only when the guilt of the subject appears highly probable."

384 U.S. at 450-51 (quoting O'Hara, Fundamentals of Criminal Investigation 112 (1956)). The Court concluded: "It is obvious that such an interrogation environment is created for no purpose other than to subjugate the individual to the will of his examiner. . . . An individual swept from familiar surroundings into police custody, surrounded by antagonistic forces, and subjected to the techniques of persuasion

described above cannot be otherwise than under compulsion to speak." *Id.* at 457, 461. As the Court later described the holding of *Miranda*, premised on the quoted observations, "[w]e concluded that the coercion inherent in custodial interrogation blurs the line between voluntary and involuntary statements." *Dickerson*, 530 U.S. at 435.

**[3]** The *Miranda* Court thus considered how to safeguard against involuntary confessions at a time when inherent pressure permeated an increasingly common investigation methodology. The due process voluntariness inquiry provided a measure of protection but required case-by-case analysis. If a certain category of cases — those involving confessions during custodial interrogations — shared the characteristic of inherent pressure, a uniform check at the front end of the interrogation — the *Miranda* warnings, rooted in the Fifth Amendment privilege against compelled self-incrimination — could be more effective and efficient than the due process back-end check. In cases in which this procedural safeguard was not satisfied, any statements made must be suppressed. *Miranda*, 384 U.S. at 444.[13] *Miranda* thus established an irrebuttable "presumption of coercion" for unwarned statements made during custodial interrogations. *See Oregon v. Elstad*, 470 U.S. 298, 307 (1985).

This prophylactic requirement admittedly sweeps in non-coerced statements, and in that respect is broader than the due process voluntariness requirement. *See Miranda*, 384 U.S. at 457 ("In these cases [decided in *Miranda*], we might not find the defendants' statements to have been involuntary in traditional terms."); *see also Dickerson*, 530 U.S. at 444 (reaffirming *Miranda* while recognizing that "[t]he disadvantage of the *Miranda* rule is that statements which may be by no means involuntary, made by a defendant who is aware of his 'rights,'

---

[13]As later cases established, statements taken in violation of a defendant's *Miranda* rights can still be used for impeachment purposes. *Harris v. New York*, 401 U.S. 222, 226 (1971).

may nonetheless be excluded and a guilty defendant go free as a result."). The Supreme Court nonetheless concluded that two aspects of the *Miranda* rule outweigh the concerns raised by its overbreadth. First, it is a bright-line rule and thus easier for law enforcement and courts to apply than the voluntariness analysis. *See Dickerson*, 530 U.S. at 444 (noting that the totality of the circumstances inquiry "is more difficult than *Miranda* for law enforcement officers to conform to, and for courts to apply in a consistent manner"). Second, and more significantly for our purposes, the overbreadth was considered by the Court to be the lesser of two evils. "In *Miranda*, the Court noted that reliance on the traditional totality-of-the-circumstances test raised a risk of overlooking an involuntary custodial confession, a risk that the Court found unacceptably great when the confession is offered in the case in chief to prove guilt." *Id.* at 442 (internal citations omitted).

[4] Critically, *Miranda*'s overinclusiveness in suppressing some noncoerced confessions made after inadequate warnings does not apply equally in the other direction: Warnings and a waiver are *not* dispositive of a confession's voluntariness. *See id.* at 444 ("The requirement that *Miranda* warnings be given does not, of course, dispense with the voluntariness inquiry."); *Berkemer v. McCarty*, 468 U.S. 420, 433 n.20 (1984) ("We do not suggest that compliance with *Miranda* conclusively establishes the voluntariness of a subsequent confession.").[14] Moreover, when analyzing the voluntariness of a confession following *Miranda* warnings, the delivered warnings, even if sufficient to satisfy *Miranda*'s prophylactic rule,

---

[14]It is rare, however, that a confession following adequate *Miranda* warnings and a valid waiver will be found involuntary. *See Missouri v. Seibert*, 542 U.S. 600, 608-09 (2004) (plurality opinion) ("[G]iving the [*Miranda*] warnings and getting a waiver has generally produced a virtual ticket of admissibility . . . and litigation over voluntariness tends to end with the finding of a valid waiver."); *Berkemer*, 468 U.S. at 433 n.20 ("[C]ases in which a defendant can make a colorable argument that a self incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare.").

must be examined in detail, as they are part of the circumstances pertinent to the voluntariness inquiry. *See Schneckloth*, 412 U.S. at 226 (listing "the lack of any advice to the accused of his constitutional rights" as a possible factor in the voluntariness analysis); *Greenwald v. Wisconsin*, 390 U.S. 519, 521 (1968) (per curiam) (considering "the lack or inadequacy of warnings as to constitutional rights" in voluntariness analysis).

In *Northern Mariana Islands v. Mendiola*, 976 F.2d 475 (9th Cir. 1992), *overruled on other grounds by George v. Camacho*, 119 F.3d 1393 (9th Cir. 1997) (en banc), for example, we declined to decide whether the questionable *Miranda* warnings alone warranted suppression of the defendant's subsequent confession. *Id.* at 483. Instead, we considered the weakness of the warnings as part of the voluntariness analysis, noting that "*Miranda* rights were administered to Mendiola in a manner that was confusing and affirmatively misleading," a fact that contributed to the finding that his confession was involuntary. *Id.* at 485-86. Similarly, in *Cooper v. Dupnik*, 963 F.2d 1220 (9th Cir. 1992) (en banc), *overruled on other grounds by Chavez v. Martinez*, 538 U.S. 760 (2003), a § 1983 action, the interrogating officer

> fully advised Cooper of his *Miranda* rights, but deliberately turned the advisement into what he hoped Cooper would perceive as a joke. [Officer] Barkman's psychological ploy was designed to make Cooper ignore the warnings, and begin to talk. Barkman intended to undercut Cooper's Constitutional right not to talk to the Task Force by complying with *Miranda*'s safeguards in form only, not in spirit or in substance.

*Id.* at 1228. In concluding that Cooper stated a cause of action based on a coercive interrogation resulting in involuntary statements, the court noted that "Cooper was advised improperly of his *Miranda* rights. Police officers may not make a

mockery of our Constitutional law by turning an advisement of rights into a persiflage." *Id.* at 1248; *see also Sims v. Georgia*, 389 U.S. 404, 406-07 (1967) (per curiam) (holding — in a case in which evidence suggested defendant was subjected to physical violence, had been in police custody for eight hours without access to friends or counsel, and was of limited education and mental capacity — that "[u]nder such circumstances the fact that the police may have warned petitioner of his right not to speak is of little significance"); *Fikes v. Alabama*, 352 U.S. 191, 193, 197 (1957) (finding confession involuntary, and noting that the interrogating officer's "testimony that he repeatedly advised petitioner 'that he was entitled to counsel and his various rights' must be viewed in the light of the facts concerning petitioner's" schizophrenia and limited education).

The individualized examination of *Miranda* warnings in a voluntariness analysis brings us back to the underlying purpose of the *Miranda* warnings, to mitigate the inherent pressure in police interrogations:

> In order to combat these pressures [inherent in a custodial interrogation] and to permit a full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored.

*Miranda*, 384 U.S. at 467. The warning that a suspect has the right to remain silent

> is an absolute prerequisite in overcoming the inherent pressures of the interrogation atmosphere. It is not just the subnormal or woefully ignorant who succumb to an interrogator's imprecations, whether implied or expressly stated, that the interrogation will continue until a confession is obtained . . . .

*Id.* at 468 (footnote omitted). The warning that anything the suspect says can be used against him in court serves in substantial part to ensure that the suspect is aware of the seriousness of the situation:

> This warning is needed in order to make him aware not only of the privilege, but also of the consequences of forgoing it. It is only through an awareness of these consequences that there can be any assurance of real understanding and intelligent exercise of the privilege. Moreover, this warning may serve to make the individual more acutely aware that he is faced with a phase of the adversary system — that he is not in the presence of persons acting solely in his interest.

*Id.* at 469. Where the warnings, although technically accurate, are conveyed in such a way as to undermine the suspect's "aware[ness] that he is faced with a phase of the adversary system," *id.*, and are further weakened by "[express] imprecations . . . that the interrogation will continue until a confession is obtained," *id.* at 468, those circumstances can be pertinent in appraising the totality of the circumstances concerning the voluntariness of any ensuing confession.

**[5]** In sum, although adequate *Miranda* warnings provide a measure of protection against coercion in custodial police interrogations, the protection *actually provided* in any given case depends on how effective the warnings as given and implemented were in conveying their layered messages. In our voluntariness analysis today, therefore, we consider the extent to which the *Miranda* warnings — although, as we first conclude, technically adequate — actually protected against a coerced confession.

## B.

## 1.

As we explain below, we hold the state court's holding that the *Miranda* warnings were adequate was not an "unreasonable application of[ ] clearly established Federal law." 28 U.S.C. § 2254(d)(1). But we also hold that the warnings were delivered so as to minimize their effectiveness in protecting against an involuntary confession.

[6] The *Miranda* warnings given to Doody did little actually to inform him, a seventeen-year-old who had never heard of *Miranda*, of the importance of his rights. The officers downplayed the relevance of the warnings, and their application to the current questioning. They repeatedly told Doody that the warnings were "not meant to scare you," and that he should not take them "out of context." The context, as communicated by the explanations surrounding the formal warnings, was that the warnings were merely a formality, and that Doody need not actually consider what their content conveyed. Indeed, the officers twice told Doody that the warnings were for *their* benefit in part: "[I]t's something that's for your benefit, as well as for ours," suggesting that delivering the warnings was simply a meaningless bureaucratic step they had to take. The officers also strongly implied that Doody was not a suspect, further underscoring the overall message that he need not be careful of what he said, the warnings to the contrary notwithstanding. Doody was told, "I don't want you to feel that because I'm reading this to you that we necessarily feel that you're responsible for anything."

[7] The clear message underlying these comments was that Doody need not take the warnings seriously and should waive his rights. Thus, although each required warning was technically delivered correctly, one of *Miranda*'s primary purposes — "to make the individual more acutely aware that he is faced with a phase of the adversary system — that he is not

in the presence of persons acting solely in his interest," *Miranda*, 384 U.S. at 469 — was undermined.

The officers' elaboration on one of the specific warnings reinforced this general message that Doody need not take the warnings seriously. Regarding the right to an attorney, Detective Riley hedged: "[A]n attorney is a lawyer who will speak for you and help you concerning the crime or any kind of offense that we might think that you or somebody else is involved in, if you were involved in it, okay. Again, it [does] not necessarily mean that you are involved, but if you were, then that's what that would apply to, okay." In addition to being simply confusing, this explanation could be construed to suggest that one would only ask for an attorney if he was guilty.

Despite the troubling subtext present throughout the warnings — that Doody should disregard the content of the warnings, not take the situation seriously, and waive his rights — we cannot conclude that the state court was objectively unreasonable in finding that the warnings satisfied the procedural requirement of *Miranda*. *Miranda* warnings need not be given "in the exact form described in that decision," as long as they "reasonably 'conve[y] to [a suspect] his rights as required by *Miranda*.'" *Duckworth v. Eagan*, 492 U.S. 195, 202-03 (1989) (alterations in original) (quoting *California v. Prysock*, 453 U.S. 355, 361 (1981)). To be found inadequate, an ambiguous warning must not readily permit an inference of the appropriate warning.

For example, in *United States v. Connell*, 869 F.2d 1349 (9th Cir. 1989), the defendant was given two sets of warnings about his right to appointed counsel. He was first told, both orally and in writing, that he had to make his "own arrangements to obtain a lawyer and this will be at no expense to the Government." *Id.* at 1350. He was then orally told that "a lawyer *may* be appointed to represent you," and given written warnings stating that, if he could not afford a lawyer, "ar-

rangements will be made for me to obtain a lawyer in *accordance with the law*." *Id.* at 1353 (emphases in original). The court held the warnings deficient:

> The oral warning, using the word "may", leaves the impression that providing an attorney, if Connell could not afford one, was discretionary with the government, particularly in light of the previous strong statement that "you must make your own arrangements to obtain a lawyer and this will be at no expense to the government." The written warning is ambiguous in that the arrangements to be made for an attorney, if Connell could not afford one, were to be "in accordance with the law." Connell is not expected to know what the requirements of the law are. In fact, conveying to the person in custody the requirements of the law is the whole purpose of the warning. Furthermore, the combination of the two different warnings created additional confusion. Thus, Connell's case is not analogous to those situations where, though not made explicit, the right to appointed counsel before and during questioning can readily be inferred from the combination of other warnings given. Rather, the ambiguous warnings he *was* given operated to dispel such an inference.

*Id.* (footnote omitted); *see also United States v. Perez-Lopez*, 348 F.3d 839, 847-48 (9th Cir. 2003) (holding inadequate warning that "you have the right to solicit the court for an attorney if you have no funds," because "[t]o be required to 'solicit' the court . . . implies the possibility of rejection"); *cf. United States v. Miguel*, 952 F.2d 285, 288 (9th Cir. 1991) (distinguishing *Connell* and holding that a single warning that defendant "may" have appointed counsel, with no prior statement that defendant had to make his own arrangements, was an adequate *Miranda* warning).

[8] Here, the officers interspersed the warnings with statements downplaying their significance. But the essential rights

were conveyed, and, unlike in cases such as *Connell* and *Perez-Lopez*, the oral elaborations of which Doody complains were not affirmatively misleading. Thus, although we find it a close question, we cannot conclude that the state court's decision that the warnings were adequate was "objectively unreasonable." *Williams*, 529 U.S. at 409.

**[9]** This conclusion only means that *Miranda*'s irrebuttable *presumption* of coercion may not be invoked. But the excessively casual delivery of *Miranda* warnings to a juvenile, seemingly designed to ensure that he would ignore the warnings and waive his rights, gives little comfort that Doody commenced the interrogation with an understanding of what was at stake. As in *Mendiola* and *Cooper*, we consider this factor in our determination of the voluntariness of Doody's confession. *See also Wilson v. Lawrence County*, 260 F.3d 946, 953 (8th Cir. 2001) (considering, in § 1983 case alleging a coerced confession, the fact that officers "downplayed the importance of those [*Miranda*] rights to Wilson, whom they knew was unlikely to understand them because of his low intelligence").[15]

Later statements by the officers further undercut the purpose of the *Miranda* warnings: to ensure that a suspect fully understands his rights and the implications of waiving them. Specifically, the officers explicitly and implicitly told Doody — an increasingly sleep-deprived juvenile — that he did *not* have the right to remain silent.[16] About five hours into the

---

[15]We note that although Doody initialed a written juvenile *Miranda* form that properly advised him of his rights, the record does not indicate that Doody read the form. The audio tapes reveal no silent periods during which Doody might have been reading, and one of the officers testified at the suppression hearing that he "handed [Doody] the form after each advisement, and asked if he would initial the appropriate box," suggesting that Doody did not have the form in front of him during most of the advisements. Moreover, even if Doody read the form, the officers' oral suggestions that the warnings were simply a formality undermined the written warnings as well as the oral ones.

[16]Doody also argues that the officers promised him his statements would stay "between us," that this was an improper promise, and that it

interrogation, Doody essentially stopped answering the officers' questions. In the face of his silence, three officers took turns asking the same questions again and again, sometimes dozens of times in a row, and repeatedly told Doody that he "ha[d]" to answer their questions: "You have to tell us"; "you have to let us know"; "if it's gonna take you all night to tell me two little simple things, we're gonna have a problem"; "Answer me, answer me Jonathan. Jonathan, answer me. Answer me."

With his silence, Doody gave every appearance of trying to exercise his right to remain silent in the precise fashion described earlier by the officers.[17] During the *Miranda* warn-

contradicted the *Miranda* warning that his statements could be used against him. The Arizona Court of Appeals rejected this interpretation of the officers' statements:

> [T]he officers assured Doody that his statements would not be disclosed to the other suspects because the officers believed Doody's fear of reprisal affected his willingness to talk. The detectives did not imply that the state would not prosecute Doody if he revealed the information or that the state would not use his statements against him in a subsequent prosecution.

*Doody*, 930 P.2d at 447. Reading the statements in context, we cannot conclude that this assessment is unreasonable, and so do not consider these particular statements as evidence of coercive police behavior or a factor in the involuntariness finding.

[17]We note that Doody does not argue, either here, in the district court, or before the state courts, that his silence in the face of repeated questioning was an invocation of his right to remain silent. *See United States v. Wallace*, 848 F.2d 1464, 1475 (9th Cir. 1988) (holding that a suspect did not waive right to remain silent when she remained silent for the first ten minutes of questioning); *United States v. Branson*, 756 F.2d 752, 753-54 (9th Cir. 1985) (holding that a suspect invoked his right to remain silent when he answered some questions, then remained silent when asked another question, where officer knew at that point that the suspect did not want to talk to the police anymore); *see also Soffar v. Cockrell*, 300 F.3d 588, 603 (5th Cir. 2002) (en banc) (DeMoss, J., dissenting) ("What in the world must an individual do to exercise his constitutional right to remain

ings, he was told: "You can be quiet if you, if you wish." But when Doody *was* quiet, the officers told him expressly that he *had* to answer them — in other words, that he could not remain silent. Their refusal to stop questioning him reinforced these express statements. Indeed, Doody was explicitly told that the interrogation would continue until he confessed: "I'm gonna stay here until I get an answer." As a result, the officers' original warning informing Doody of his right to remain silent, itself a casual and underplayed message, was negated by their subsequent conduct, telling Doody he could not be silent, but rather that he must answer.[18]

[10] In short, although the state court's conclusion that there was no *Miranda* violation was reasonable, the safety net that proper, serious *Miranda* warnings provide — that of informing a suspect of his rights and of the gravity of the situation — was quite weak in this case, prone to give way as a protection against an involuntary confession if conditions were otherwise conducive to such a confession. As it turns out, they were.

---

silent beyond actually, in fact, remaining silent?"). *But see Evans v. Demosthenes*, 98 F.3d 1174, 1176 (9th Cir. 1996) (leaving it an open question whether, "notwithstanding . . . *Davis* [*v. United States*, 512 U.S. 452 (1994)], a defendant who wishes to assert his right to remain silent may do so by simply remaining silent in the face of interrogation."). We express no view on the matter.

[18]We do not decide, because we need not in light of our ultimate holding, whether, under clearly established federal law, this conduct "de-*Mirandized*" Doody, as he argues, by providing advice contradicting that given during the formal warnings — namely, that he was required to answer and could not invoke his right to remain silent. *See Hart v. Attorney Gen.*, 323 F.3d 884, 894-85 (11th Cir. 2003). We do, however, consider the mandatory tone and language as part of the totality of the circumstances voluntariness analysis.

**2.**

We now turn to the voluntariness inquiry. At the outset, we find it notable that the officers' long lectures on how important it was for Doody to tell them the truth, which included repeated statements that they "knew" his denials of involvement were not true, did *not* alone result in his confession. Had Doody begun to confess shortly after those admonitions, it might be reasonable to assume that the officers persuaded him that confessing was in his best interests. His confession would thus be voluntary.

**[11]** But Doody did not confess to any involvement in the temple murders until about 2:45 to 3:30 a.m., after Doody had been interrogated for several hours already, three officers subjected him to forty-five minutes of repeated, overwhelmingly unanswered questions, interspersed with commands that Doody "had" to answer. This timing alone strongly suggests that his will was overcome not by the interrogating officers' pleading imprecations noted by the state court, but by the officers' overall, interrelated, coercive messages that they would continue relentlessly questioning him until he told them what they wanted to hear, and that he would eventually have to do so. *See Colorado v. Connelly*, 479 U.S. 157, 167 (1986) (holding that "coercive police activity is a necessary predicate to" a finding that a confession was not voluntary). These messages were believable, given the officers' extraordinary persistence in the face of Doody's silence to that point, the number of hours the interrogation had already gone on, and Doody's inevitable fatigue at 2:45 to 3:30 in the morning. As *Miranda* noted, "[i]t is not just the subnormal or woefully ignorant who succumb to an interrogator's imprecations, whether implied or expressly stated, that the interrogation will continue until a confession is obtained." 384 U.S. at 468.

A somewhat similar, but considerably less coercive, situation was presented in *Woods v. Clusen*, 794 F.2d 293 (7th Cir. 1986). In *Woods*, a sixteen-year-old, after receiving *Miranda*

warnings, was interrogated for two consecutive sessions of about twenty minutes each. During one session, the police officers "suggested things would 'be better' or 'go easier' " if Woods answered the questions. *Id.* at 295. At the second session, the officers deceptively told Woods that they had found his fingerprints on the victim's wallet. Woods answered only one question during these sessions, before eventually confessing to the crime. *Id.* at 295-96 The Seventh Circuit found his confession involuntary, noting:

> Woods' confession ended the second interrogation after approximately one-half hour, yet one wonders how long the attempt to squeeze a confession from Woods could have lasted? Certainly, Woods must have wondered if and when the inquisition would ever cease.

*Id.* at 298 (footnote omitted); *compare Fare v. Michael C.*, 442 U.S. 707, 726-27 (1979) (holding the confession of a sixteen-year-old "with considerable experience with the police" voluntary where "[h]e was not worn down by improper interrogation tactics or lengthy questioning or by trickery or deceit").

Compounding the troubling scenario in this case is Doody's particular vulnerability to the officers' tactics: his age — seventeen — and the length of the interrogation, more than twelve unbroken hours, embracing an entire night.[19] The Supreme Court has long recognized that "admissions and confessions of juveniles require special caution." *In re Gault*, 387 U.S. 1, 45 (1967); *see also Roper v. Simmons*, 543 U.S. 551, 569-70 (2005) (discussing the unique vulnerabilities of juveniles, citing, *inter alia*, *Johnson v. Texas*, 509 U.S. 350, 367

---

[19]Although the record does not explicitly so state, Doody likely attended school the day the interrogation began. The interrogation began on a Friday, and Doody was picked up at his high school, during a football game at which he participated as part of the junior ROTC.

(1993) and *Eddings v. Oklahoma*, 455 U.S. 104, 115-16 (1982)). Doody's vulnerability because of his youth was enhanced by the fact that he had never been arrested before and, as he told the officers, had never heard of *Miranda* rights. *See United States ex rel. Lewis v. Henderson*, 520 F.2d 896, 901 (2d Cir. 1975) (noting that the twenty-two-year-old suspect had "little prior experience with police methods, thus rendering him particularly susceptible to police pressure").[20] And numerous cases recognize the coercive potential in unbroken hours of interrogation of a juvenile, particularly when they take place overnight. *See Haley v. Ohio*, 332 U.S. 596, 600-01 (1948);[21] *Taylor v. Maddox*, 366 F.3d 992, 1014-16 (9th Cir. 2004); *Thomas v. North Carolina*, 447 F.2d 1320, 1321-22 (4th Cir. 1971); *compare Bridges v. Chambers*, 447 F.3d 994, 999 (7th Cir. 2006) (holding a seventeen-year-old's confession voluntary where he was detained overnight but "the actual questioning . . . was relatively brief . . . [and t]here was no evidence he was not allowed to sleep between interviews").

---

[20]The Arizona Court of Appeals, in applying the totality of the circumstances voluntariness test, did not mention Doody's lack of experience with law enforcement. Doody argues that the state court's failure to consider this factor, as well as its failure to consider Doody's immaturity and cultural background, alone render the decision "contrary to" federal law, § 2254(d)(1), as an improper application of the totality of the circumstances test. We do not so hold, *see Schneckloth*, 412 U.S. at 226 (listing "[s]ome of the factors taken into account" in voluntariness inquiries, noting that "none of [the Supreme Court's prior voluntariness decisions] turned on the presence or absence of a single controlling criterion"), but we do consider the state court's failure to mention the factors in concluding that the decision was an "unreasonable application of clearly established Federal law." § 2254(d)(1).

[21]Pre-*Miranda* cases remain binding on and relevant to the voluntariness inquiry. *See, e.g.*, *Arizona v. Fulminante*, 499 U.S. 279, 287-88 (1991) (holding a confession involuntary, relying on, *inter alia*, *Blackburn v. Alabama,* 361 U.S. 199 (1960); *Culombe v. Connecticut*, 367 U.S. 568 (1961); *Reck v. Pate*, 367 U.S. 433 (1961); *Rogers v. Richmond*, 365 U.S. 534 (1961); *Payne v. Arkansas*, 356 U.S. 560 (1958); and *Watts v. Indiana*, 338 U.S. 49 (1949)).

Nor was Doody interrogated in the presence of any friendly adult. Instead, he faced interrogation, alone, by two, three, and four officers at a time. Even though Doody agreed at the outset to speak to the officers without his parents present, the absence of a friendly adult is a factor in assessing the voluntariness of a juvenile's confession. *See Gilbert v. Merchant*, 488 F.3d 780, 791 (7th Cir. 2007) ("[T]he absence or presence of a parent or other friendly adult [is an] additional factor[ ] that bear[s] on the voluntariness of the juvenile's confession. A juvenile's ability to consult with a friendly adult is relevant because, as the Supreme Court explained in *Gallegos v. Colorado*[, 370 U.S. 49, 54 (1962)], a teenager may not on his own be able to fully appreciate what is at stake when the police seek to question him . . . ." ) (citation omitted); *see also Gallegos*, 370 U.S. at 54 (considering the absence of a parent or attorney in the voluntariness inquiry, even though the juvenile was advised of the right to an attorney and requested neither a parent nor an attorney).[22]

---

[22]We note that task force officers met with Doody's stepfather three times after they believed Doody might be connected to the murders — twice after they knew Doody would be brought in for questioning — and never mentioned to him their suspicions about Doody or their plans to question him. Most tellingly, task force members interviewed Doody's stepfather and brother — who had traveled from out of town at the officers' request — about the temple the day before Doody was brought in for questioning. Although the interviewing officers learned, in the middle of this interview, that the murder weapon belonged to Caratachea, who they knew was Doody's former roommate, they did not inform Doody's stepfather of this development or suggest that he stay in town longer than he planned. Nor was anything mentioned to Doody's stepfather when he stopped by the task force headquarters just hours before Doody was picked up for questioning and after it was determined that he would be. Finally, a task force officer met with Doody's stepfather to reimburse him for travel expenses on the evening of October 25 — in other words, while officers were picking Doody up for questioning — but again did not mention that his stepson was about to be interrogated.

We recognize that voluntariness hinges on the perception of the suspect, so circumstances of which the suspect was unaware at the time of questioning are not relevant. *See Moran v. Burbine*, 475 U.S. 412, 422-23 (1986); *United States v. Hankey*, 203 F.3d 1160, 1174 & n.13 (9th Cir.

Indeed, the content of Doody's confession itself provides strong evidence that his will was overborne. Although, early in his confession, he insisted that the Tucson Four were not at the temple during the robbery and murders, the officers simply refused to accept this assertion and asked many questions about the involvement of the Tucson Four. Doody finally responded with answers consistent with the officers' insistence that the Tucson Four were at the temple with Doody: he said that about ten people — not five — were involved, two or three were black, and some of them might have been from Tucson. In other words, facing the officers' refusal to stop questioning him until they received the answers they wanted, Doody succumbed by providing some information that was suggested by the officers' questions but that the state now concedes is not true.

Moreover, the state court's characterization of the interrogation contains significant "unreasonable determination[s] of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2), which, in part, undergirded the state court's conclusion that the confession was voluntary. These factual errors contribute to our conclusion that the decision was unreasonable. *See Wiggins v. Smith*, 539 U.S. 510, 528 (2003) ("This partial reliance on an erroneous factual finding further highlights the unreasonableness of the state court's decision.").

First, the state court — inexplicably — found that Doody was "alert and responsive throughout the interrogation." Although there was testimony at the suppression hearing that he was alert for at least portions of the interrogation, it is sim-

---

2000). Further, we express no opinion on whether the task force actively sought to ensure that Doody's stepfather would not learn of Doody's interrogation, as Doody argues. Nonetheless, it is indisputable that, despite ample opportunity requiring no special effort, the task force failed to notify a minor's guardian of the minor's impending interview with police about his possible involvement in a multiple homicide.

ply wrong to characterize him as "responsive." The tapes
reveal long stretches of silence — as long as ten minutes —
in the face of dozens of questions in a row. Indeed, the state
court decision later acknowledged that "Doody did not speak
for long periods during the interrogation," a statement incon-
sistent with the earlier finding that he was "responsive
throughout." As discussed above, Doody's non-
responsiveness, and the officers' relentless attempts to get
him to respond, weigh heavily in the voluntariness analysis.

The state court also found that the officers' questioning was
"courteous, [and] almost pleading." Although the officers'
questions by and large were, as the state court noted, couched
in "pleading" language, their tones at times were far from
pleasant. Indeed, their tones varied from "pleading" to scold-
ing to sarcastic to demeaning to demanding. In any event, no
matter the tone, twelve hours of insistent questioning of a
juvenile by tag-teams of two, three and four officers became
menacing and coercive, and decidedly *not* "courteous." And
some of their statements — particularly those which directly
preceded his confession — told Doody that he *had* to answer
their questions. Those statements were *not* "pleading[s]" —
they were commands. Nor is there anything "courteous," or
merely "pleading," about statements such as, "I'm gonna stay
here until I get an answer."

Finally, the state court found that, after only two and one-
half hours, Doody admitted that "he had borrowed Carat-
achea's rifle at the time of the temple murders." Not so.
Doody did admit around that time that he and Garcia bor-
rowed the gun for two days. But he stated that it was "close
to the end of June" that he borrowed the gun, more than a
month before the murders, and so indicated that he did *not*
have the gun "at the time of the temple murders." This error
is of great significance. A key factor in this voluntariness
inquiry is the length of the interrogation before the confes-
sion. And, as it turns out, Doody did not confess to *any* con-

nection to the temple murders until over *six hours* of interrogation.

* * *

**[12]** A juvenile was given *Miranda* warnings in a down-played manner that ensured he would not take them seriously and would waive his rights. With only a flimsy version of the protection the *Miranda* warnings are designed to provide, he was then interrogated for more than twelve hours, overnight, almost entirely without pause and with no friendly adult present. He was told that he *had* to answer the officers' questions and that the interrogation would not end until he confessed. He was finally broken down by the ceaseless questioning of two, three, and four police officers, questioning that continued despite his frequent long stretches of silence. Under these circumstances, we conclude, he did not voluntarily confess. The state court's holding to the contrary was, for the reasons we have surveyed, an "objectively unreasonable" application of clearly established federal law. *See Williams*, 529 U.S. at 409.

## C.

The state argues, in the alternative, that any error was harmless. Because the Arizona courts found no error, they did not reach the issue of harmlessness. Our review is therefore *de novo*. *See Rompilla v. Beard*, 545 U.S. 374, 390 (2005); *Frantz v. Hazey*, 533 F.3d 724, 736 (9th Cir. 2008) (en banc).

**[13]** Confessions are indisputably damning evidence:

> A confession is like no other evidence. Indeed, "the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him. . . . [T]he admissions of a defendant come from the actor himself, the most knowledgeable and unimpeachable source of information about his past conduct." . . . . In the case of a coerced con-

> fession . . . , the risk that the confession is unreliable, coupled with the profound impact that the confession has upon the jury, requires a reviewing court to exercise extreme caution before determining that the admission of the confession at trial was harmless.

*Arizona v. Fulminante*, 499 U.S. 279, 296 (1991) (first two alterations in original) (quoting *Bruton v. United States*, 391 U.S. 123, 139-40 (1968) (White, J., dissenting)).

**[14]** The state here relied heavily on Doody's confession, playing all seventeen tapes of the interrogation for the jury. *See Moore v. Czerniak*, 534 F.3d 1128, 1147 (9th Cir. 2008) (noting the particularly prejudicial impact of "a taped recording of a defendant's confession taken with all the requisite formalities by police officers and played to a jury that hears the defendant's confession in the defendant's own words from his own lips"). Moreover, the prosecutor's opening and closing statements reviewed and recounted the confession in great detail. As the confession did not align with the state's theory of Doody's role, the prosecutor carefully analyzed which portions proved Doody's involvement in the murders, and which portions the state believed were lies.

The strongest additional evidence against Doody was Garcia's testimony. But the jury plainly did not credit that testimony. Garcia testified that Doody contemplated the murders while planning the robbery, and, with premeditation, shot the monks himself. The special verdict form, however, indicated that Doody was convicted on felony-murder grounds, not for premeditated murder. Significantly, the state, in its closing statement, told the jurors that, if they believed only the version of events set forth in Doody's confession, they should convict him of felony-murder. Doody thus could well have been convicted on the basis of his confession alone.

**[15]** Other than his confession and Garcia's testimony, the evidence against Doody was weak. Doody's supposedly

incriminating statements to friends were, according to the witnesses' own testimony, understood as jokes. The evidence linking him to items stolen from the temple depended almost entirely on the testimony of friends of Caratachea's who testified with immunity and not without self-interest, as the stolen items had been linked to them. Stolen items found in Garcia's bedroom — which Doody shared at the time it was searched — were not connected specifically to Doody.

There was some circumstantial evidence that was somewhat more persuasive: One non-self-interested witness testified that Doody claimed ownership of one item stolen from the temple. Also, an acquaintance of Doody's testified that Doody paid the witness $1,000 that he owed for a car shortly after the murders, although before the murders he had been unable to pay. But the defense impeached this testimony with the witness's prior statement that Doody had paid for the car *before* the murders.

**[16]** In sum, discounting Garcia's testimony, as the jury did, the state's case relied almost entirely on his confession and some peripheral, circumstantial evidence. We have no difficulty in concluding that the erroneous admission of Doody's confession had a "substantial and injurious effect or influence" on the jury's verdict. *Brecht*, 507 U.S. at 623.

## IV.   CONCLUSION

For the foregoing reasons, we AFFIRM in part, REVERSE in part, and REMAND with directions to grant the petition.