IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>Respondent,<br><br>v.<br><br>TOMMY PARIS GIBSON,<br><br>Appellant. | No. 86725-3-1<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

CHUNG, J. — Tommy Gibson was convicted of child molestation in the second degree. On appeal, Gibson challenges the admission of certain evidence, including statements he made during a custodial interrogation, text messages from his phone, and an audio recording and transcript of a phone call between the child victim, C.M., and her mother. Gibson also challenges community custody conditions requiring him to be available for urinalysis and/or breath analysis and to remain within certain geographic boundaries. We hold that the trial court did not err by admitting the challenged evidence and the community custody conditions are constitutional. Therefore, we affirm Gibson's conviction and sentence.

BACKGROUND

Beginning in spring 2018, Gibson lived with minor C.M. and her mother, Ke'ala Blackston, for approximately a year and half prior to the charged incident. In November 2019, Blackston was arrested for driving on a suspended license

and was incarcerated until January 2020. After Blackston was arrested, C.M. remained in the house alone with Gibson.

According to C.M., Gibson sexually molested her in her bedroom on December 10, 2019. After Gibson left her room, C.M. called one of her aunts, Wendy Zema, disclosed the assault, and asked to stay with Zema instead of at Blackston's home with Gibson. C.M. sent an Instagram message to a friend, A.G., disclosing the assault and then went to school later that day. At school, A.G. took C.M. to the school counselor. C.M. disclosed the assault to the counselor, who reported the incident to Child Protective Services.

The evening of the assault, Blackston—who was still in jail—called C.M. During this call, C.M. disclosed the assault. Two days after the assault, Zema took C.M. to the hospital for a forensic evaluation and interview. Two days after that, C.M.'s aunts reported the incident to the police, who came to her house to take a report.

Based on the disclosures from C.M., her aunts, the school counselor, and the forensic interviewer, Seattle Police Detective Shawn Martinell obtained a warrant to arrest Gibson and seize his phone on January 2, 2020. The warrant application noted that Gibson had allegedly texted C.M. after the incident until she blocked his phone number.

Martinell contacted Gibson, who agreed to meet at a Whole Foods grocery store. There, Martinell explained that he wanted to speak with Gibson and that he was under arrest and not free to leave. Martinell then transported Gibson to the police station to interview him. Martinell did not recall reading Gibson his

2

Miranda[1] rights at Whole Foods, but during the recorded interview, before asking

questions, Martinell gave this Miranda warning:

> You have the right to remain silent. Anything you say can be used against you in a court of law. You have the right at this time to talk to a lawyer and have him present with you while you are being questioned. If you cannot afford to hire a lawyer, one will be appointed to represent you for any questioning if you wish. Do you understand your rights, sir?

Gibson responded, "Yes."

During the interrogation, Gibson mentioned he had been texting with C.M.

and Zema, and Zema texted him not to text C.M. and that she was going to call

the police. Over 50 minutes into the interrogation, when Martinell asked Gibson

about C.M.'s friends, Gibson stated,

> I'm kind of like done talking, to be honest. . . . I just feel like I probably even shouldn't even -- should be -- probably just talk to a lawyer . . . because I don't have all the facts . . . straight, you know, as far as what happened then and what happened at that time.

Martinell responded, "Okay. That's fair. You still want to show me those

messages?" Then, the following exchange occurred:

> MR. GIBSON: Umm, I mean, I don't know. What do you think?
>
> THE DETECTIVE: Well, I'll tell you, you remember I said I talked to a judge?
>
> MR. GIBSON: Uh-huh.
>
> THE DETECTIVE: And so the Judge told me that I get to look in your phone. I have a search warrant for it already.
>
> MR. GIBSON: Okay.
>
> THE DETECTIVE: So, I mean, we're going to take a look in the phone. But you showing me would be great so we -- I mean, because I don't need to see everything in your phone.

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

MR. GIBSON: Okay.

THE DETECTIVE: But you don't have to walk me through your phone. That's perfectly fine not to.

MR. GIBSON: Right.

THE DETECTIVE: Okay

MR. GIBSON: I don't know. Like, should I show you my whole phone or just show you, like --

THE DETECTIVE: No, you --

MR. GIBSON: -- just those messages?

THE DETECTIVE: -- you mentioned some messages and we talked about you wanted to show me. If you want to, that's great, if you don't, that's fine too.

MR. GIBSON: Okay. I'll show you.

THE DETECTIVE: Okay.

Gibson then read the messages between him and C.M.'s aunt out loud. In these messages, Gibson and C.M.'s aunt discussed making a house key for C.M. When Gibson finished reading the messages, Martinell told Gibson "I do need to hold on to the phone" and asked Gibson if there was a pass code. Gibson first said he would "just leave it on" for Martinell, then instead, he offered to "take the pass code off" for him. Martinell explained that as part of their process, someone else would "make a copy" of his phone, and it was "not something that [he was] going to do right now so it'll turn off." After watching Gibson struggle with the phone's settings to remove the pass code, Martinell asked Gibson, "[D]o you mind just giving me the pass code in case it does lock?" Gibson responded with the code.

4

Three weeks later,[2] Martinell applied for a warrant to search the contents of Gibson's phone. Martinell referenced Gibson's statements in the interrogation as a basis for the warrant but did not include any screenshots of the texts or specific quotes from the text messages that Gibson read during his interrogation. The court issued the warrant, and Gibson's phone was searched using a software program called Cellebrite.

During pretrial, after a CrR 3.5 hearing, the trial court held that the phone call arranging the Whole Foods meeting was not a custodial interrogation. Further, during the interrogation that occurred at the police station, Gibson did not invoke his constitutional rights, so his statements during that recorded interrogation were admissible.

At the CrR 3.5 hearing, Gibson moved to exclude as hearsay C.M.'s disclosure to her mother during the recorded jail phone call. The court admitted a portion of the phone call, limited to C.M.'s statements regarding the fact of the complaint, and excluded statements about Gibson's identity and "details of [the] type of touching or inappropriate conduct." At a later hearing, after listening to the jail call, which the State had redacted pursuant to the court's order, the trial court revised its ruling and admitted the redacted phone call under the hearsay exception for an excited utterance:

> [T]he statement made by CM on the phone call to Mom comes in under at least an excited utterance because I find that her emotional reaction to what had transpired in her disclosure as evidenced by her tearfulness and spontaneously saying that she's sorry indicates that she appears to be still under the excitement of the startling event or condition. . . . Mom's response . . . is a clear

[2] Gibson was interviewed on January 2, 2020. Martinell applied for the second warrant on January 29, 2020.

5

emotional response. And so I find that, too, comes in under the excited utterance exception.

Further, the trial court concluded that both statements "arguably" were also admissible under the "then-existing mental, emotional, or physical condition or state of mind" exception and the mother's reactions were also admissible as present sense impressions, because during the same phone call, within a minute or two, she was "perceiving the event and then say[ing], I'm sorry, I'm sorry."

Gibson was convicted of child molestation in the second degree and sentenced to 20 months in prison and 36 months of community custody. This appeal followed.

## DISCUSSION

On appeal, Gibson asserts that the trial court erred by admitting the statements from the interrogation, his text messages to C.M. and Zema, and the recorded jail phone call between C.M. and her mother. Gibson also challenges the constitutionality of the community custody provisions requiring him submit to urinalysis/breath analysis and to "[r]emain within geographic boundaries, as set forth in writing by the [Community Custody Officer (CCO)] or as set forth with a SODA order."

### I. Gibson's Interrogation Statements and Text Messages

Gibson asserts that the Miranda warnings issued by Martinell were improper and, thus, his statements, including his phone pass code, were not made voluntarily and should have been suppressed. Specifically, Gibson avers that Martinell's statement that Gibson had a right to a lawyer "at this time" misled Gibson as to the scope of his rights, so he involuntarily waived his right against

6

self-incrimination. He also claims that Martinell impermissibly coerced Gibson to give him access to Gibson's cell phone by alluding that there was a search warrant for the phone. Further, he claims that the court should have suppressed the text messages between Gibson and C.M. and between Gibson and Zema that were "discovered during the unlawful search of Gibson's cell phone." We disagree.

This court reviews CrR 3.5 determinations using two standards of review. "We review the trial court's findings of fact for substantial evidence," and we review the trial court's conclusions of law de novo. State v. Mayer, 184 Wn.2d 548, 555, 362 P.3d 745 (2015). Here, the facts related to the statements at issue were undisputed before the trial court, and Gibson does not challenge them on appeal. Undisputed facts are verities on appeal. State v. O'Neill, 148 Wn.2d 564, 571, 62 P.3d 489 (2003).

The State may not introduce a defendant's statement from a custodial interrogation at trial unless the defendant was told of the " 'procedural safeguards effective to secure the privilege against self-incrimination' "—the Miranda warnings "or their equivalent." Rhode Island v. Innis, 446 U.S. 291, 297-98 (1980) (quoting Miranda v. Arizona, 384 U.S. 436, 444 (1966)). "[I]nterrogation in certain custodial circumstances is inherently coercive and . . . statements made under those circumstances are inadmissible unless the suspect is specifically warned of his Miranda rights and freely decides to forgo those rights." New York v. Quarles, 467 U.S. 649, 654 (1984) (footnote omitted).

"[T]he adequacy of the warnings and the validity of a purported waiver turn on the particular facts and circumstances surrounding the case." Mayer, 184 Wn.2d at 559-60 (citing State v. Earls, 116 Wn.2d 364, 378-79, 805 P.2d 211 (1991); Edwards v. Arizona, 451 U.S. 477, 482 (1981)). The inquiry into the adequacy of the warnings asks "whether the warnings reasonably 'conve[y] to [a suspect] his rights as required by Miranda.' " Mayer, 184 Wn.2d at 560 (internal quotation marks removed) (quoting Duckworth v. Eagan, 492 U.S. 195, 203 (1989) (alterations in original)). The voluntariness inquiry "is whether the Defendant's will was overborne." State v. Broadaway, 133 Wn.2d 118, 132, 942 P.2d 363 (1997). To determine voluntariness, "the Court evaluates 'all the circumstances of the interrogation,' " including the conduct of the police and the defendant's physical and mental condition. State v. Rupe, 101 Wn.2d 664, 679, 683 P.2d 571 (quoting Mincey v. Arizona, 437 U.S. 385, 401 (1978)). "In assessing the totality of the circumstances, a court must consider any promises or misrepresentations made by the interrogating officers." Broadaway, 133 Wn.2d at 132.

Here, Gibson waived his Miranda rights voluntarily. First, Martinell provided a proper Miranda warning. "To satisfy its burden of showing a valid waiver, the government need not demonstrate that the Miranda warnings given were a word-for-word copy of the language that the Supreme Court provided in Miranda itself." Mayer, 184 Wn.2d at 558-59. Miranda warnings are inadequate if they " 'downplay [ ] the relevance of the warnings[ ] and their application to the current questioning.' " Id. at 562 (alteration in original) (quoting Doody v. Schriro,

548 F.3d 847, 862-63 (9th Cir. 2008)). They are also inadequate if they are unclear due to " 'different and conflicting sets of warnings.' " Id. at 562 (quoting United States v. San Juan-Cruz, 314 F.3d 384, 387-88 (9th Cir. 2002)). For example, in Mayer, the officer told the defendant, "If you cannot afford to hire a lawyer, one will be appointed to represent you *before questioning* if you wish." 184 Wn.2d at 560. When the defendant asked how he could obtain an appointed attorney, the officer responded that counsel would be appointed only

> "*if* you were charged with a crime and arrested[ and] *if* you wanted an attorney and couldn't afford one . . . . You're not under arrest at this point . . . So, *if* you were, then you *would* be taken to jail and *then* you'd go before a judge and . . . you *would* [be] afforded an attorney . . . if you weren't able to afford one."

Id. (alteration in original). The court reasoned that this Miranda warning was insufficient because the officer's statements were contradictory:

> These statements by [the officer] conditioned Mayer's right to appointed counsel on the occurrence of several future events: being arrested, which [the officer] stressed had not yet occurred; being charged with a crime; being taken to jail; and being taken before a judge. Plainly, all of these events would occur, if at all, *after* the impending interrogation rather than before. Thus, [the officer]'s responses to Mayer's questions about the appointment process contradicted his earlier statement, as part of the initial Miranda recitation, that counsel would be appointed for him "before questioning."

Id. at 560-61. Importantly, the Supreme Court noted that it "could reject Mayer's Miranda challenge with no need for extended comment" if the Miranda challenge concerned only the officer's initial recitation of the Miranda warning or the officer's "later statements regarding the timing of appointment of counsel." Id. at 561. It was only when the statements were taken together that the Miranda violation resulting from the statements' contradiction became apparent. See id.

Here, Martinell's <u>Miranda</u> warning and use of the phrase "at this time" did not downplay the importance or relevance of Gibson's <u>Miranda</u> rights, express conditionality of the rights against self-incrimination, or conflict with any other instructions. To the contrary, the phrase "at this time" mirrors precisely the type of temporal modifier the officer initially made in <u>Mayer</u> that the court held was not by itself a <u>Miranda</u> violation. <u>See</u> <u>id.</u> at 560-61. When Gibson was asked if he understood his rights, he answered in the affirmative. He did not ask additional clarifying questions, and Martinell did not make any statements contradicting his initial <u>Miranda</u> recitation. Indeed, Gibson's later statement that he should "probably" talk to a lawyer demonstrated an understanding that he *could* talk to a lawyer at that point if he wanted to.

Second, Gibson's will was not overborne. Martinell initially went to Gibson's home, but he was not there, so Martinell called him. Gibson returned the call and agreed to meet with Martinell. They sat at tables in the Whole Foods market where Martinell "explained what was going on and that [he] wanted to speak with [Gibson]. And that [Gibson] was under arrest and not free to leave." Then, they walked out to the parking lot where Martinell placed Gibson in handcuffs and in the patrol car. At the police station, Martinell read Gibson his <u>Miranda</u> rights and the interview took place. The court's unchallenged findings included that "Gibson was allowed to speak freely, there was no aggressiveness from Det. Martinell, [and] no threats." Martinell "used open-ended questions," "[t]he defendant was talkative," and for "largely the entire hour" Gibson engaged in "long narratives with very little interruption." Martinell did not use tactics that

10

our Supreme Court describes as "overly zealous" or "coercive." See Rupe, 101 Wn.2d at 679. And Gibson was given water and was allowed to use the restroom.

Additionally, while Gibson was describing the text interaction with Zema, Gibson voluntarily offered to Martinell that "[Y]ou can read the text." Even if Martinell falsely stated later in the interrogation that he had a warrant to search Gibson's phone,[3] before he made this statement, Gibson voluntarily provided Martinell with consent to read the message. The court's unchallenged findings state that Martinell "emphasized Mr. Gibson didn't have to show him the phone." The court concluded there was "no confusion, lack of understanding, threats or promises made to Mr. Gibson to induce him to speak," and Martinell "did not intend to use any deception."

Moreover, Gibson had stated at the beginning of the interrogation that he understood his rights and proceeded to speak for almost 40 minutes before stating that he should "probably" talk to a lawyer. The trial court concluded this was "an equivocal mention of the right to counsel and nothing more."[4] We agree. "It is well established that Miranda rights must be invoked unambiguously." State v. Piatnitsky, 180 Wn.2d 407, 413, 325 P.3d 167 (2014). "To be unequivocal, an invocation of Miranda requires the expression of an objective intent to cease communication with interrogating officers." Id. at 412 (footnote omitted). Nothing

---

[3] Martinell's later statement to Gibson, "you remember I said I talked to a judge? . . . Judge told me that I get to look in your phone. I have a search warrant for it already," suggests that Martinell may have told Gibson at an earlier point that he already had a warrant to search the phone, but there is no record evidence confirming or denying this possibility.

[4] Gibson does not assert on appeal that he was deprived of his right to counsel.

in the record suggests that Gibson's will was overborne. Thus, the court did not

err by admitting the statements Gibson made during the interrogation, including

providing Martinell with the pass code to his cell phone.

Nevertheless, Gibson argues that his text messages should have been

excluded from trial as "fruit of the poisonous tree"[5] of his interrogation. But

Gibson did not seek to suppress the text messages under CrR 3.6, and Gibson's

text messages are not statements to which CrR 3.5 applies. CrR 3.5 addresses

hearings on the admissibility of "statement[s] of the accused," while CrR 3.6

addresses motions to suppress physical, oral or identification evidence "other

than" motions under CrR 3.5. Indeed, the trial court and Gibson's counsel

discussed whether CrR 3.6 was at issue during the CrR 3.5 hearing:

> THE COURT: . . . Mr. Johnson, you didn't specifically flag a 3.6 but just in hearing some of the questions and looking at your trial memo, were you intending to or is this sort of warrant issue related to the 3.5 as opposed to the separate 3.6?
>
> MR. JOHNSON: . . . I think it is somewhat 3.6-like, but I wasn't planning to file anything in addition . . . . But essentially it is an argument that there is a derivative fruit of the poisonous tree from the 3.5 hearing, from the statement.
>
> THE COURT: Right. Although you started touching on the scope of a warrant and that sort of thing. So for purposes of the 3.6 rule, though, there needs to be -- obviously should have been filed an affidavit in support of that motion together with your authority for that and counsel to have an opportunity to respond . . . . I certainly would like to have more authority than what you've cited being in the trial memo if that's the route you're going to go, Mr. Johnson.

---

[5] See State v. Ladson, 138 Wn.2d 343, 359, 979 P.2d 833 (1999) ("When an unconstitutional search or seizure occurs, all subsequently uncovered evidence becomes fruit of the poisonous tree and must be suppressed.").

Gibson did not subsequently file any CrR 3.6 motion, and the trial court made findings of fact and conclusions of law pursuant to CrR 3.5 only. Because Gibson did not challenge the admission of the text messages obtained pursuant to the warrant at trial, there is no trial court ruling on this issue for us to review.

Moreover, the argument fails as a factual matter. To the extent Martinell's application for the second warrant—which allowed the Cellebrite phone search through which the text messages were obtained—relied on Gibson's statements, it relied only on his statements made prior to Martinell's false representation that he had a warrant to search the phone. In relevant part, the warrant application stated,

> Gibson used his cell phone to message CEM, and Wendy Zema about the incident. When Gibson was arrested, he was in possession of the cell phone. Detectives had a signed search warrant for Mr. Gibson and Mr. Gibson's cell phone at the time of the arrest. Gibson stated that he used the cell phone to talk with Wendy Zema after CEM started living with Wendy. Gibson referenced these messages during a recorded police interview. After the interview the phone was taken into police custody.

The warrant application did not rely on the text messages Gibson showed Martinell later during the interrogation. Martinell testified that the only additional information that he needed to obtain the second warrant was identifying information of the phone, such as its serial number. Accordingly, Gibson's provision of the pass code for his phone was not a "poisonous tree" that bore fruit in the form of Gibson's text messages.[6]

---

[6] The State argues that regardless of whether the text messages were fruit of the poisonous tree, the text messages were admissible under the "independent source" doctrine because the State could have obtained the second warrant and searched Gibson's phone absent Gibson's statements in interrogation. Under the "independent source" doctrine, "fruit of the poisonous tree" may still be admissible if it is, or could have been, obtained "pursuant to a valid

II. <u>Phone Call between C.M. and Blackston</u>

Gibson challenges the admission of a recorded jail phone call between

C.M. and Blackston, C.M.'s mother. During this phone call, C.M. disclosed the

alleged assault as follows:

MS. BLACKSTON: Hi, Baby.

[C.M.]: Hi, Mom.

MS. BLACKSTON: Are you okay?

[C.M.]: Umm. Sure.

MS. BLACKSTON: So what's going on? Why are you going to [your aunt's home]?

[C.M.]: I don't know—I don't really know how to tell you this. Tommy tried to touch me today, that's why I'm going.

MS. BLACKSTON: Where did he try to touch you?

 . . . .

[C.M.]: My genitals.

MS. BLACKSTON: Are you serious?

[C.M.]: Yeah.

MS. BLACKSTON: Oh my god. Oh my god.

[C.M.]: I'm sorry.

---

warrant or other lawful means independent of the unlawful action." <u>State v. Gaines</u>, 154 Wn.2d 711, 718, 116 P.3d 993 (2005). However, neither party substantiates whether the State had the technical *capability* to search Gibson's phone without his password, which Gibson disclosed during the interrogation. Neither Martinell nor Seattle Police Detective Darin Sugai (who extracted the data from Gibson's phone using Cellebrite) was asked at trial about this topic. And neither party provided further briefing on this point. Gibson cites to only one case that is not controlling, <u>United States v. Booker</u>, 561 F. Supp. 3d 924, 933 (S.D. Cal. 2021), to suggest that the State may not have been able to extract the messages from his phone via Cellebrite without his password. However, without evidence or a factual finding on this point, this court cannot determine whether the Cellebrite-extracted texts would have been accessible to the State from an "independent source." Thus, we reject the State's alternative "independent source" argument.

MS. BLACKSTON: No I'm sorry, Baby. Was this the first time?

[C.M.]: Yeah.

MS. BLACKSTON: Like—like in your pants or under your shirt?

[C.M.]: In my pants.

MS. BLACKSTON: Oh my god. I'm sorry.

 . . . .

[C.M.]: I'm sorry—Mom. No, I'm sorry.

MS. BLACKSTON: It's not your fault. It's not your fault. I don't know, like, how did this happen? What happened?

[C.M.]: I was stressed out so he gave me a massage and, I don't know, he just [INAUDIBLE]. I told him to stop and he stopped.

Gibson argues that the trial court abused its discretion when it allowed the State to play this recording because it was inadmissible hearsay.[7] The State argues that the trial court properly determined the call was admissible as an excited utterance.[8] We agree with the State.

We review a trial court's decision to admit a hearsay statement as an excited utterance for an abuse of discretion. State v. Ohlson, 162 Wn.2d 1, 7-8, 168 P.3d 1273 (2007). "Discretion is abused when the trial court's decision is manifestly unreasonable, or is exercised on untenable grounds, or for untenable reasons." State v. Blackwell, 120 Wn.2d 822, 830, 845 P.2d 1017 (1993).

---

[7] Gibson challenges both the statements made by C.M. to Blackston and by Blackston to C.M.

[8] The State posits that Blackston's statements were not offered for the truth of the matter asserted and thus were not hearsay. Gibson did not contest this assertion in his reply brief. Instead, Gibson argues that because C.M.'s statements should have been excluded, there would be "nothing for Blackston to have a response to" and therefore her statements could not be excited utterances and, further, would "have no relevance." Accordingly, it is uncontested that Blackston's statements were not hearsay, and the question with respect to this phone call is only whether C.M.'s statements were admissible.

Under ER 803(a)(2), an excited utterance is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." As explained by our Supreme Court, "[t]he crucial question in all cases is whether the statement was made while the declarant was still under the influence of the event to the extent that his statement could not be the result of fabrication, intervening actions, or the exercise of choice or judgment." Johnston v. Ohls, 76 Wn.2d 398, 406, 457 P.2d 194 (1969)). Statements made in response to questions may be excited utterances. State v. Bache, 146 Wn. App. 897, 904, 193 P.3d 198 (2008) (citing Johnston, 76 Wn.2d at 405-6). However, the statements must be "natural declaration[s] of fact relating to the event." State v. Woodward, 32 Wn. App. 204, 206, 646 P.2d 135 (1982).

Whether a hearsay declarant was "still under the stress of the startling events when they made the statements" is a factual inquiry. State v. Hardy, 133 Wn.2d 701, 714, 946 P.2d 1175 (1997). To determine whether a declarant is still under the stress of a startling event, courts can consider "circumstantial evidence such as 'the declarant's behavior, appearance, and condition; appraisals of the declarant by others; and the circumstances under which the statement is made.' " State v. Rodriquez, 187 Wn. App. 922, 938-39, 352 P.3d 200 (2015) (quoting State v. Young, 160 Wn.2d 799, 809-10, 161 P.3d 967 (2007)).

Washington courts have held that a declarant's significant emotional response when recounting a past event, even after several hours had elapsed, can demonstrate that a declarant is still under the stress of a startling event. For

16

example, in State v. Woods, our Supreme Court held that the trial court did not abuse its discretion in admitting statements made by a victim to a paramedic 45 minutes after an incident because, *inter alia*, the victim was " 'whimpering, like crying almost' and was 'very emotional, very distraught, clearly upset and in a lot of pain.' " 143 Wn.2d 561, 599, 23 P.3d 1046 (2001). In State v. Strauss, our Supreme Court found no abuse of discretion where a trial court admitted statements made to the police officer up to three and a half hours after the startling incident because the declarant "was very distraught, very red in the face and crying . . . [and] appeared to be in a state of shock resulting from the incident." 119 Wn.2d 401, 416, 832 P.2d 78 (1992). In State v. Thomas, this court found no abuse of discretion where a trial court admitted statements made six to seven hours after a startling event and the declarant "was upset and crying on the telephone, and none of her responses were the product of leading questions." 46 Wn. App. 280, 284-85, 730 P.2d 117 (1986), aff'd, 110 Wn.2d 859, 757 P.2d 512 (1988).

However, the record must show more than that the declarant was "upset." Compare State v. Dixon, 37 Wn. App. 867, 870, 873-74, 684 P.2d 725 (1984) (trial court abused discretion in admitting detailed, four-page written statement made over the course of two hours as an excited utterance where police described the declarant as "continu[ing] to be upset" while writing the statement), with Bache, 146 Wn. App. at 904 (trial court's admission of statements as excited utterances "easily supported by [the] record" where the victim's mother testified that when the victim was making the statements, she "was fidgety . . . teary and

looked like she was afraid . . . [and] her face was flushed like she'd seen a ghost"). By contrast, a calm disposition can demonstrate that a declarant was *not* under the influence of a startling event. See State v. Doe, 105 Wn.2d 889, 893- 94, 719 P.2d 554 (1986) (trial court was correct in concluding that statement was not an excited utterance where three days passed since the incident, part of the statement was made in response to a question, and the declarant was "calm" when she made the statement).

Generally, "the more time that passes will usually increase the likelihood that the controlling stress of the event has lessened and the ability of the declarant to . . . fabricate has been recovered." Dixon, 37 Wn. App. at 873. Likewise, there is an "increase[d] [ ] danger of fabrication" where, between the incident and the statement, the declarant is "calm" and "engaged in [their] usual activities." State v. Chapin, 118 Wn.2d 681, 689, 826 P.2d 194 (1992). See also State v. Owens, 78 Wn. App. 897, 901, 899 P.2d 833 (1995), aff'd, 128 Wn.2d 908, 913 P.2d 366 (1996) (trial court erred in admitting statement as excited utterance where statement was made "after some time had elapsed" and after declarant was comforted by grandmother); State v. Bargas, 52 Wn. App. 700, 704, 763 P.2d 470 (1988) (no excited utterance where statements were made after declarant had slept, showered, talked to a friend, and was calmed by an officer before making the statement). But neither the passage of time nor engagement in ordinary activities alone disqualifies a statement from the excited utterance exception. Strauss, 119 Wn.2d at 416-17. For example, in Woodward, Division Two of this court held that it was not an abuse of discretion for a trial

court to admit statements made by a child at least 20 hours after a startling event and the child had "engage[d] in different activities between the event and disclosure to her mother." 32 Wn. App. at 206-07. The court held "th[o]se factors" were outweighed by, among other considerations, "the child's tender age, her physical condition," and the lack of "indications of intervening influences" in the record "which [would] demonstrate the unreliability of the child's statements." Id. at 207.

Here, the assault occurred on the morning of December 10, and the call between C.M. and Blackston was that evening from 8:16 p.m. to 8:28 p.m. C.M. had disclosed the assault to multiple other people before speaking to her mother, and she had gone to school later in the day of the incident. The trial court determined that neither the timing of the statements nor that C.M. attended school between the startling event and the utterance outweighed the other indicia of reliability, including C.M.'s emotional expression or the context in which the statements were made:

> I find that her emotional reaction to what had transpired in her disclosure as evidenced by her tearfulness and spontaneously saying that she's sorry indicates that she appears to be still under the excitement of the startling event or condition.
>
>  . . . .
>
> [T]he context in which the disclosure was made . . . further establishes reliability because . . . it does seem to be, frankly, quite spontaneous. It wasn't as if she was in trouble with her mother and had to come up with some sort of explanation for behavior or failing to do anything.

19

The record supports the trial court's finding. C.M. disclosed the assault to her mother in response to an open-ended, non-leading question, and she and her mother were both emotional on the call.

A trial court's "thorough and articulate consideration of all the circumstances surrounding the hearsay statements" can provide "ample assurance that the statements were trustworthy." State v. Young, 123 Wn. App. 854, 861, 99 P.3d 1244 (2004), aff'd, 160 Wn.2d 799 (2007) (trial court did not abuse its discretion in admitting statements by child victim as excited utterance). Here, given the trial court's factual finding that C.M. was under the influence of a startling event and its thorough and articulate reasoning for finding the statements reliable, the court's decision was based on tenable grounds and tenable reasons. Thus, we hold the trial court did not abuse its discretion in admitting the phone call as an excited utterance.

III. Community Custody Conditions

Gibson initially challenged a condition of custody requiring him to "[b]e available for and submit to urinalysis and/or breath[ ]analysis upon request of the CCO and/or chemical dependency treatment provider" for invading his "Fourth Amendment and article I, section 7 rights to privacy." Gibson conceded this argument in his reply brief. Accordingly, we address only Gibson's challenge to the geographic community custody condition.

This court recently addressed the same community custody condition and concluded that the condition was not unconstitutionally vague. State v.

Lundstrom, 34 Wn. App. 2d 977, 981-83, 572 P.3d 1243 (2025). We adopt the reasoning in Lundstrom and reject Gibson's argument.

CONCLUSION

Affirmed.

_Chung, J._

WE CONCUR:

_Feldman, J._                     _Mann, J._